The **PURE OIL COMPANY**, as Owner of the Steel Tank Barges P. O. 1601, P. O. 1602 and P. O. 1604, Libelant,

v.

**THE F. B. WALKER**, her engines, tackle, etc., and Simpson Oil Company, Inc., Respondent.

No. 2310.

United States District Court, E. D. Louisiana, New Orleans Division.

Jan. 28, 1955.

Deutsch, Kerrigan & Stiles, Francis Emmett, New Orleans, La., for libelant.

Terriberry, Young, Rault & Carroll, Joseph M. Rault, Jr., New Orleans, La., for respondent.

WRIGHT, District Judge.

On April 15, 1951, the tow of the M/V R. H. McElroy, owned by The Pure Oil Company, and the tow of the Tug F. B. Walker collided at a bend on the left descending bank of the Illinois River at Mile 149.4. The Pure Oil Company as owner of the damaged Barges P. O. 1601, P. O. 1602 and P. O. 1604 libeled the Tug F. B. Walker and her owner, Simpson Oil Company, on April 8, 1953. Simpson Oil Company thereafter impleaded the M/V R. H. McElroy and her owner. In addition to the question of fault, respondent makes the defense of laches.

### Findings of Fact

1. Shortly before 7:50 A. M. on April 15, 1951, the M/V R. H. McElroy was bound down the Illinois River with the steel tank Barges P. O. 1601, P. O. 1602, P. O. 1603 and P. O. 1604 in tow.

2. The McElroy was pushing these four barges in tandem, two abreast, and was faced up to the P. O. 1602. The P. O. 1601 was the port lead barge, and the P. O. 1604 the starboard lead barge. The P. O. 1602 was faced up headlog to sternlog with the P. O. 1601, and the P. O. 1603 was faced up headlog to sternlog with the P. O. 1604. The P. O. 1602 was loaded, and the other barges were light. These barges were identical, and each had a length of about 240 feet and a beam of 45 feet.

3. The McElroy had an approximate length of 118 feet and beam of 45 feet. She was powered by two pilothouse controlled Fairbanks-Morse diesel engines with a total of 3200 HP and was in every respect seaworthy.

4. Shortly before 7:50 A. M., April 15, 1951, when the McElroy was in the vicinity of the Lower Pekin Railroad Bridge (Mile 152), her pilot called three times on the radio to ascertain whether or not there was any upbound traffic

around the bends that lay downriver. There was no answer to his call.

5. The weather at this time was cloudy; visibility was excellent; there was little wind and the McElroy had a current underfoot of from two to three miles per hour.

6. The Illinois River is a tributary of the Mississippi River. Below the Pekin Railroad Bridge (Mile 152) and Turkey Island Light (Mile 149.4), it makes a slight right-hand turn, then a sharp left-hand turn and then another right-hand turn. The river has a channel width in this vicinity of about 325 feet or 350 feet and is about 400 feet wide from bank to bank.

7. The McElroy was proceeding at full speed, about eight or nine miles per hour over the ground. She negotiated the first right-hand and the left-hand turn below the Pekin Railroad Bridge without incident. As her tow rounded the second right-hand bend near Turkey Island Light (Mile 149.4), her mate, who was working on the starboard lead barge, sighted the Tug F. B. Walker pushing a tow of three barges, about one-half mile off, in the center of the river favoring the right descending side of the channel, making about seven miles per hour.

8. The Tug F. B. Walker was powered by two engine room controlled diesel engines having a total of 2640 HP. Her propeller shafts were without brakes.

9. The mate signaled the presence of the Walker and her tow to the pilot on the McElroy, who immediately sounded a two-blast whistle signal for a starboard-to-starboard passing with the Walker, as the McElroy was then sliding around the bend.

10. The Walker did not answer this proposed passing signal but continued ahead at the same speed in the center of the channel. The McElroy then stopped her engines, started backing full astern and sounded the danger signal. The Walker did not answer this danger signal and continued ahead on the same course and speed. About half a minute later, and when her headway was practically stopped, the McElroy repeated her danger signal as the Walker appeared to be holding her course and speed. The Walker answered this second danger signal immediately but continued ahead and veered toward the left descending bank.

11. The McElroy then started picking up sternway, and her pilot swung the head of the tow over to the left descending bank and her stern into the right descending bank trying to move the barges out of the way so that the Walker could hit the bank and stop her headway before colliding with the McElroy's tow.

12. When the Walker was about 100 feet from the McElroy's tow which was then stopped and lying on the bank, her engines started astern for the first time. Shortly thereafter the two tows collided on the left descending bank in the bend just below Turkey Island Light (Mile 149.4) at about 7:50 A. M.

13. The Walker's pilot had put her engine order telegraph on full speed astern three or four minutes before collision but her engineers did not start her engines going astern until seconds before collision.

14. The Walker's engineers did not reverse her engines immediately upon receiving the pilot's order for full astern either because the Walker's propeller shafts were without brakes, making it necessary for them to wait that length of time for her propeller shafts to stop rotating in a forward direction before reversing, or because they simply did not reverse the engines promptly or properly.

Conclusions of Law

1. The Court has jurisdiction of this action and venue is properly laid in the Eastern District of Louisiana. 28 U.S.C. § 1333.

2. Under the doctrine of laches, no set limitation is placed on the time for bringing suit. The Key City, 14 Wall. 653, 81 U.S. 653, 20 L.Ed. 896. Courts of admiralty, however, will apply the statute of limitations of the state in which suit is brought unless equitable reasons exist for not doing so. Morales v. Moore-McCormack Lines, Inc., 5 Cir.,

208 F.2d 218; McGrath v. Panama Ry. Co., 5 Cir., 298 F. 303. Where there has been no inexcusable delay in seeking a remedy and where the respondent has not been prejudiced by the mere passage of time, there should be no bar to relief. Gardner v. Panama Railroad Co., 342 U.S. 29, 72 S.Ct. 12, 96 L.Ed. 31. However, the burden is upon the libelant to prove no inexcusable delay and no prejudice to the respondent in order to overcome the defense of laches. Morales v. Moore-McCormack Lines, supra; McGrath v. Panama Ry. Co., supra.

■ 3. The prescriptive period for bringing tort actions in Louisiana is one year,[1] whereas the statute of limitations in Illinois,[2] where the collision occurred, is five years. Although this libel was not filed until almost two years after the tort occurred, that fact alone does not justify a mechanical application of Louisiana's one-year prescription on tort actions. Gardner v. Panama Railroad Co., supra. The record here discloses no inexcusable neglect or delay on the part of the libelant nor prejudice to respondent. Consequently, this action should not be considered time-barred, particularly in view of the five-year statute of limitations at the situs of the tort.

4. The Illinois River is a tributary of the Mississippi River and navigation thereon is governed by Pilot Rules for Western Rivers. 33 U.S.C.A. § 301.

■ 5. The McElroy, as the downbound vessel, had the right of way over the upbound Walker and, considering the urgent need at the time for an agreement on passing, she was not at fault for initiating a two-blast whistle signal proposing a starboard-to-starboard passing with the Walker when she was on her own left-hand side of channel rounding the bend at Turkey Island Light (Mile 149.4). Western River Rule 18(b), 33 U.S.C.A. § 343. Nor was the McElroy at fault in rounding the bend on the left descending side of the channel. The Western River Rules[3] do not require a port-to-port passing for ascending and descending vessels, and it has been judicially recognized, at least as far as the Mississippi River itself is concerned, that the downbound vessel with the current underfoot runs the bends, and the upbound vessel rounds the points. The Norne, 5 Cir., 59 F.2d 145; The Stephen R. Jones, 5 Cir., 27 F.2d 208; The John D. Rockefeller, 4 Cir., 272 F. 67; Compania de Navegacion Cristobal, S. A. v. The Lisa R., D.C., 112 F.Supp. 501.

■ 6. The failure of the Walker and the McElroy to sound a warning whistle signal on approaching the bend at Turkey Island Light was a fault on the part of both vessels but those errors were so remotely connected with the collision that they did not contribute to its occurrence. P. Dougherty Co. v. United States, 3 Cir., 207 F.2d 626, 630-632; The Sanday, The Michigan, 2 Cir., 122 F. 2d 325; The Nereus, 2 Cir., 23 F. 448, 457.

■ 7. The navigators of the Walker and the McElroy sighted each other's vessels in ample time to avoid collision. The McElroy reacted promptly in the emergency and, in spite of the current, actually gathered sternway before the collision. The Walker's engines were not reversed until three or four minutes after her pilot had ordered them full astern. Collision would not have occurred except for the Walker's delay in this respect and, accordingly, this was the sole cause of collision. If the delay in reversing resulted from the Walker's failure to have brakes on her propeller shafts, she was unseaworthy. The Albert Dumois, 177 U.S. 240, 253, 20 S.Ct. 595, 44 L.Ed. 751; The Silver Palm, 9 Cir., 94 F.2d 776; Id., D.C., 13 F.Supp. 212, 1936 A.M.C. 80; The Panther, 2 Cir., 5 F.2d 64; The Mexico, 2 Cir., 78 F. 653, 655. If the delay was not occasioned by this deficiency it must have been caused by the negligence of her en-

---

1. LSA-C.C. Art. 3536.

2. Smith-Hurd, Illinois Annotated Statutes, Chapter 83, Section 16.

3. 33 U.S.C.A. § 343, Rule 18.

gineers in failing to reverse her engines promptly or properly. The Sanday, The Michigan, supra; The Watuppa, 2 Cir., 120 F.2d 766, 768; The El Monte, 5 Cir., 252 F. 59; The Abangarez (The O-5) 60 F.2d 543, 1932 A.M.C. 1247; Colonial Nav. Co. v. United States (The Lexington-Submarine O-7) 14 F.2d 480, 1926 A.M.C. 1051.

8. Libelant is entitled to recover of and from respondent its damages with interest from this date and its costs.